# United States Court of Appeals for the Federal Circuit

---

**NANTKWEST, INC.,**
*Plaintiff-Appellee*

v.

**ANDREI IANCU, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**
*Defendant-Appellant*

---

2016-1794

---

Appeal from the United States District Court for the Eastern District of Virginia in No. 1:13-cv-01566-GBL-TCB, Judge Gerald Bruce Lee.

---

Decided: July 27, 2018

---

MORGAN CHU, Irell & Manella LLP, Los Angeles, CA, argued for plaintiff-appellee. Also represented by LAUREN NICOLE DRAKE, GARY N. FRISCHLING, ALAN J. HEINRICH; SANDRA HABERNY, Newport Beach, CA.

JAYNIE RANDALL LILLEY, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BENJAMIN C. MIZER, DANA J. BOENTE, MARK R. FREEMAN;

THOMAS W. KRAUSE, THOMAS L. CASAGRANDE, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

ANTHONY J. DREYER, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for amicus curiae International Trademark Association. Also represented by MARK N. MUTTERPERL, Zeisler PLLC, New York, NY.

WILLIAM P. ATKINS, Pillsbury Winthrop Shaw Pittman LLP, McLean, VA, for amicus curiae Federal Circuit Bar Association. Also represented by WILLIAM K. WEST, JR., Washington, DC; MARTIN SCOTT HIGH, Martin S. High, P.C., Clemson, SC.

KEVIN TOTTIS, TottisLaw, Chicago, IL, for amicus curiae American Intellectual Property Law Association. Also represented by MONICA L. THOMPSON, RACHEL M. VORBEK; LISA K. JORGENSON, American Intellectual Property Law Association, Arlington, VA.

GREGORY A. CASTANIAS, Jones Day, Washington, DC, for amicus curiae Intellectual Property Owners Association. Also represented by DANIEL KAZHDAN; HENRY S. HADAD, Bristol-Myers Squibb Company, Princeton, NJ; MARK W. LAUROESCH, Intellectual Property Owners Association, Washington, DC; STEVEN W. MILLER, Global Legal Department, Procter & Gamble Company, Cincinnati, OH.

HILARIE BASS, Greenberg Traurig, P.A., Miami, FL, for amicus curiae American Bar Association. Also represented by SALVATORE ANASTASI, Barley Snyder, Malvern, PA; JOSHUA SCHWARTZ, Lancaster, PA; DONALD W. RUPERT, Marshall, Gerstein & Borun LLP, Chicago, IL; CHARLES W. SHIFLEY, Banner & Witcoff, Ltd., Chicago, IL.

MARGARET MARY DUNCAN, McDermott Will & Emery LLP, Chicago, IL, for amicus curiae Intellectual Property Law Association of Chicago. Also represented by DAVID MLAVER, Washington, DC; ROBERT H. RESIS, CHARLES W. SHIFLEY, Banner & Witcoff, Ltd., Chicago, IL.

CHARLES ERIC MILLER, Eaton & Van Winkle LLP, New York, NY, for amicus curiae Association of Amicus Counsel. Also represented by KELLY L. MORRON, Law Offices of Kelly L. Morron, Wilton, CT; JONATHAN E. MOSKIN, Foley & Lardner LLP, New York, NY; ROBERT JOSEPH RANDO, The Rando Law Firm P.C., Syosset, NY; ALAN M. SACK, SACK IP Law PC, Syosset, NY.

PATRICK RICHARD DELANEY, Ditthavong & Steiner, P.C., Alexandria, VA, for amicus curiae Realvirt, LLC.

CHARLES ERIC MILLER, Eaton & Van Winkle LLP, New York, NY, for amici curiae Isshiki & Co., Hiraide & Takahashi.

_____

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, HUGHES, and STOLL, *Circuit Judges*.[*]

Opinion for the court filed by *Circuit Judge* STOLL, in which *Circuit Judges* NEWMAN, LOURIE, MOORE, O'MALLEY, WALLACH, and TARANTO join.

Dissenting opinion filed by *Chief Judge* PROST, in which *Circuit Judges* DYK, REYNA, and HUGHES join.

_____

[*] Circuit Judge Chen did not participate.

STOLL, *Circuit Judge*.

When the United States Patent and Trademark Office's Patent Trial and Appeal Board ("Board") affirms an examiner's rejection of a patent application, § 145 of the Patent Act permits the disappointed applicant to challenge the Board's decision in district court. Applicants who invoke § 145 are required by statute to pay "[a]ll the expenses of the proceedings" incurred by the U.S. Patent and Trademark Office ("PTO") in defending the Board's decision, regardless of the outcome. Historically, the agency relied on this provision to recover sums it spent on travel and printing and, more recently, expert witnesses. Now, 170 years after Congress introduced § 145's predecessor, the agency argues that § 145 also compels applicants to pay its attorneys' fees. We hold that it does not, for the American Rule prohibits courts from shifting attorneys' fees from one party to another absent a "specific and explicit" directive from Congress. The phrase "[a]ll the expenses of the proceedings" falls short of this stringent standard. Accordingly, we affirm the district court's judgment.

I

A

The Patent Act gives applicants two mutually exclusive options for judicial review of an adverse Board decision. First, the applicant may appeal directly to this court. 35 U.S.C. § 141. Second, the applicant may file a civil action against the Director of the PTO in the United States District Court for the Eastern District of Virginia. 35 U.S.C. § 145. We, in turn, have jurisdiction over subsequent appeals from the district court under 28 U.S.C. § 1295(a)(1).

Section 141 provides standard judicial review of an agency decision under the Administrative Procedure Act. We review the Board's legal determinations de novo,

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1353 (Fed. Cir. 2017), and we "set aside the PTO's factual findings only if they are 'unsupported by substantial evidence,'" *Kappos v. Hyatt*, 566 U.S. 431, 435 (2012) (quoting *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999)). Importantly, appellate review in § 141 proceedings is confined to the record before the PTO. 35 U.S.C. § 144.

Section 145, by contrast, authorizes a more expansive challenge to the Board's decision and is generally more time consuming. For example, patent applicants can conduct discovery and introduce new evidence. And once an applicant submits new evidence on a disputed factual question, "the district court must make a *de novo* finding." *Hyatt*, 566 U.S. at 434–35 ("This opportunity . . . is significant, not the least because the PTO generally does not accept oral testimony."). The parties may also engage in motion practice, and the proceeding can culminate in a full-blown trial. Congress set the price for engaging the PTO in this type of litigation: "All the expenses of the proceedings shall be paid by the applicant." 35 U.S.C. § 145. Thus, an applicant who proceeds under § 145 must shoulder not only his own significant expenses and fees, but also the PTO's "expenses of the proceedings."

Congress introduced § 145's predecessor in 1839,[1] and over the years, the PTO has relied on these "expenses" provisions to recover PTO attorneys' travel expenses to attend depositions, *see Robertson v. Cooper*, 46 F.2d 766, 769 (4th Cir. 1931), printing expenses, *cf. Cook v. Watson*,

---

[1]     The original language from 1839 required an applicant to pay "the whole of the expenses of the proceeding . . . whether the final decision shall be in his favor or otherwise." Act of Mar. 3, 1839, ch. 88, § 10, 5 Stat. 353, 354. Neither party argues that subsequent revisions to § 145 impact our analysis.

208 F.2d 529, 530 (D.C. Cir. 1953), court reporter fees, and reasonable fees for expert witnesses, *see Sandvik Aktiebolag v. Samuels*, CIV. A. No. 89-3127-LFO, 1991 WL 25774, at \*1 (D.D.C. Feb. 7, 1991). For more than 170 years, however, the PTO never sought—and no court ever awarded—attorneys' fees under § 145 or its predecessor.

## B

As its name suggests, the American Rule is a "bedrock principle" of this country's jurisprudence. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010). It provides that, in the United States, "[e]ach litigant pays his own attorney's fees, win or lose." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015) (quoting *Hardt*, 560 U.S. at 253). The American Rule may only be displaced by an express grant from Congress. *Id.* And it serves as the "basic point of reference" whenever a court "consider[s] the award of attorney's fees." *Id.* (quoting *Hardt*, 560 U.S. at 252–53).

The rationale supporting the American Rule is rooted in fair access to the legal system, as well as the difficulty of litigating the fee question:

> [S]ince litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and . . . the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration.

*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967) (citations omitted). In the context of this case, the American Rule preserves access to

district courts for small businesses and individual inventors seeking to avail themselves of § 145's benefits.

The American Rule traces its origins back to at least the late 1700s. In *Arcambel v. Wiseman*, the circuit court included $1,600 in counsel's fees as part of the damages. 3 U.S. (3 Dall.) 306, 306 (1796). The assessment of attorneys' fees, the Supreme Court concluded, could not be allowed because the "general practice of the United States is in opposition to it; and even if that practice were not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute." *Id.* "[O]ur courts have generally resisted any movement" toward the English system—which permits the award of attorneys' fees to successful parties in litigation—ever since.[2] *Fleischmann*, 386 U.S. at 717; *see Runyon v. McCrary*, 427 U.S. 160, 185 (1976) ("[T]he law of the United States . . . has always been that absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation.").

---

[2] The Supreme Court has carved out several equitable exceptions to further the interests of justice. *See F. D. Rich Co. v. U.S. for Use of Indus. Lumber Co.*, 417 U.S. 116, 129 (1974) (acknowledging availability of attorneys' fees where party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"); *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426–28 (1923) (allowing attorneys' fees as part of penalty for willful disobedience of court order); *Trustees v. Greenough*, 105 U.S. 527, 532–33, 537 (1882) (permitting party recovering fund for the benefit of himself and others to seek attorneys' fees from the fund itself or directly from other parties who enjoyed the benefit); *see generally Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257–59 (1975). None of these exceptions are implicated here.

Only Congress "has the power and judgment to pick and choose among its statutes and to allow attorneys' fees under some, but not others." *Alyeska Pipeline*, 421 U.S. at 263. Congress has not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Id.* at 260. Thus, the Supreme Court has held that the American Rule presumptively applies and any statutory deviations from it must be "specific and explicit." *Id.* at 260–62, 269.

According to the Supreme Court, one "good example of the clarity . . . required to deviate from the American Rule" can be found in the Equal Access to Justice Act's attorneys' fees provision. *Baker Botts*, 135 S. Ct. at 2164. That provision commands courts to "award to a prevailing party other than the United States *fees and other expenses* . . . incurred by that party in any civil action," so long as certain conditions are met. *Id.* at 2164 (emphasis added) (quoting 28 U.S.C. § 2412(d)(1)(A)). As the Supreme Court explained, "there could be little dispute that this provision—which mentions 'fees,' a 'prevailing party,' and a 'civil action'—is a 'fee-shifting statut[e]' that trumps the American Rule." *Id.* (alteration in original).

Not all fee-shifting statutes follow this template though. For example, the Supreme Court has a separate line of precedent "addressing statutory deviations from the American Rule that do not limit attorney's fees awards to the 'prevailing party.'" *Hardt*, 560 U.S. at 254. In *Hardt*, the Court analyzed whether Congress deviated from the American Rule when it passed a statute providing that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *Id.* at 251–52 (quoting 29 U.S.C. § 1132(g)(1)). The same is true in *Ruckelshaus v. Sierra Club*, where the Court examined a provision of the Clean Air Act allowing a court to "award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines

that such an award is appropriate." 463 U.S. 680, 682–83 (1983) (emphasis omitted) (quoting 42 U.S.C. § 7607(f)).

And while the American Rule sets a high bar for shifting attorneys' fees, it does not impose a magic words requirement so long as Congress's intent is "specific and explicit." *See Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters*, 456 U.S. 717, 721–22 (1982). As the Supreme Court acknowledged in *Key Tronic Corp. v. United States*, "[t]he absence of [a] specific reference to attorney's fees is not dispositive if the statute otherwise evinces an intent to provide for such fees." 511 U.S. 809, 815 (1994); *see Baker Botts*, 135 S. Ct. at 2165 (discussing statute providing for "reasonable compensation for actual, necessary services rendered by" various "professional person[s]," including "attorney[s]" (emphasis omitted) (quoting 11 U.S.C. § 330(a)(1)(A))).

## II

This brings us to the procedural background of the current case. In 2001, Dr. Hans Klingemann filed a patent application directed to a method for treating cancer using natural killer cells. Dr. Klingemann's application was eventually assigned to NantKwest, Inc. The examiner rejected the application as obvious in 2010, and the Board affirmed the rejection in 2013.

Pursuant to § 145, NantKwest challenged the Board's decision by filing a complaint against the Director of the PTO in the U.S. District Court for the Eastern District of Virginia. Discovery ensued and the PTO moved for summary judgment that the application's claims would have been obvious. The district court granted the PTO's motion, and we affirmed. *See NantKwest, Inc. v. Lee*, 686 F. App'x 864, 865 (Fed. Cir. 2017). After prevailing on the merits, the PTO filed a motion for reimbursement of the "expenses of the proceedings" under § 145. The $111,696.39 sum sought by the PTO included $78,592.50 in attorneys' fees—calculated based on the pro rata sala-

ries of the two PTO attorneys and one paralegal who worked on the case—and $33,103.89 in expert witness fees.

The district court denied the PTO's motion with respect to attorneys' fees, citing the American Rule. *Nan[tK]west, Inc. v. Lee*, 162 F. Supp. 3d 540, 542–43 (E.D. Va. 2016). In the court's view, "Congress's reference to '*all* . . . the expenses' merely points to a *collection* of the expenses used, commonly understood to encompass . . . printing, travel, and reasonable expert witness expenses." *Id.* at 543. The district court noted that "[i]n § 145 Congress neither used the phrase 'attorneys' fees' nor 'fees' nor any alternative phrase demonstrating a clear reference to attorneys' fees." *Id.* at 545. It then concluded that the "ambiguity regarding the exact reach of the term 'expenses' means § 145 does not meet the Supreme Court's *Baker Botts* standard and therefore, cannot deviate from the American Rule." *Id.*

The PTO appealed the denial of its motion to recover attorneys' fees, and a divided panel of this court reversed the district court's judgment. The majority relied on the Fourth Circuit's opinion in *Shammas v. Focarino*, which interpreted a nearly identical provision of the Lanham Act, 15 U.S.C. § 1071(b)(3). 784 F.3d 219, 223–24 (4th Cir. 2015). There, the Fourth Circuit held that the American Rule only applies to statutes that refer to a "prevailing party." *Id.* at 223. Referring to this language, the majority here voiced "substantial doubts" that § 145 implicates the American Rule because it imposes the PTO's expenses on applicants without referring to a "prevailing party." *NantKwest, Inc. v. Matal*, 860 F.3d 1352, 1355 (Fed. Cir. 2017). Nevertheless, the majority assumed the American Rule applied for purposes of its analysis and concluded that the word "expenses" "'specific[ally]' and 'explicit[ly]' authorizes an award of fees." *Id.* at 1356 (alterations in original) (quoting *Alyeska Pipeline*, 421 U.S. at 260). For support, the majority

relied on dictionaries defining "expenses" as "expenditure[s] of money, time, *labor*, or resources to accomplish a result," *id.* (alteration in original) (quoting *Black's Law Dictionary* 698 (10th ed. 2014)), and a statement from *Taniguchi v. Kan Pacific Saipan, Ltd.*, distinguishing "taxable costs" from "nontaxable expenses," *id.* at 1357 (quoting 566 U.S. 560, 573 (2012)). Finally, the majority rejected NantKwest's contention that pro-rata salaries of the PTO's employees were not "expenses of the proceedings." *Id.* at 1359.[3]

Our court voted sua sponte to hear the appeal en banc and vacated the panel's judgment. *NantKwest, Inc. v. Matal*, 869 F.3d 1327 (Fed. Cir. 2017). We requested briefing on a single question: whether the panel "correctly determine[d] that 35 U.S.C. § 145's '[a]ll the expenses of the proceedings' provision authorizes an award of the [PTO's] attorneys' fees." *Id.* at 1327. In addition to the parties' briefs and argument, we received seven amicus briefs, none of which support the PTO's position. We now affirm the judgment of the district court.

## III

We review de novo a district court's interpretation of a statute. *Boston Sci. Scimed, Inc. v. Medtronic Vascular,*

---

[3] Following issuance of this Court's *NantKwest* decision, the PTO requested and received attorneys' fees in at least one § 145 action. *See, e.g.*, *Realvirt, LLC v. Lee*, 220 F. Supp. 3d 695, 704 (E.D. Va. 2016) (awarding more than $48,000 in attorneys' fees in § 145 action). The PTO also convinced a district court to impose a $40,000 bond on a pro se plaintiff who filed suit under § 145. *Taylor v. Lee*, No. 1:15-CV-1607, 2016 WL 9308420, at *2 (E.D. Va. July 12, 2016) (requiring payment of bond before permitting § 145 action to proceed, but noting uncertainty surrounding applicant's finances).

*Inc.*, 497 F.3d 1293, 1296 (Fed. Cir. 2007). Unless otherwise defined, words in a statute "will be interpreted as taking their ordinary, contemporary, common meaning." *Summit Valley*, 456 U.S. at 722 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

According to the PTO, the American Rule does not govern our interpretation of § 145. Even if it does, the PTO and the dissent aver that the statutory text suffices to displace this long-standing, common-law rule. We disagree on both counts and address each issue in turn.

## A

At the outset, we hold that the American Rule applies to § 145. As noted, the American Rule provides that each litigant bears its own attorneys' fees, win or lose, and a statute must use "specific and explicit" language to depart from this rule. The Supreme Court in *Baker Botts* emphasized that the American Rule is the starting point whenever a party seeks to shift fees from one side to the other in adversarial litigation. 135 S. Ct. at 2164 (explaining that "when considering the award of attorney's fees," the American Rule constitutes the "basic point of reference" (quoting *Hardt*, 560 U.S. at 252–53)). Because the PTO contends that § 145 should be construed to shift its attorneys' fees to the patent applicants bringing suit, the American Rule necessarily applies. Accordingly, we must be able to discern from § 145's text a "specific and explicit" congressional directive to make an award of attorneys' fees available. *Alyeska Pipeline*, 421 U.S. at 260.

We are not persuaded by the PTO's contrary arguments for why the American Rule should not apply to litigation under § 145. The PTO begins by relying on the Fourth Circuit's *Shammas* opinion for the proposition that the American Rule only governs the interpretation of statutes that shift fees from a prevailing party to a losing party. Because § 145 imposes "[a]ll the expenses" on the

applicant, win or lose, the PTO asserts it is not a fee-shifting statute that falls within the American Rule's ambit. We disagree. Given the primary purpose of the American Rule—protection of access to courts—the PTO's alleged distinction makes little sense. We submit that the policy behind the American Rule would be even more strongly implicated where attorneys' fees would be imposed on a winning plaintiff.

In *Shammas*, a divided panel of the Fourth Circuit awarded attorneys' fees to the PTO under 15 U.S.C. § 1071(b)(3)—the trademark analogue to § 145—which also refers to "all the expenses of the proceeding." The *Shammas* court reached this decision only by first holding that the American Rule does not apply to § 1071(b)(3). 784 F.3d at 223. Based on a narrow interpretation of the Supreme Court's statement in *Alyeska Pipeline*, the Fourth Circuit held that "the American Rule provides only that '*the prevailing party* may not recover attorneys' fees' *from the losing party*." *Id.* (quoting *Alyeska Pipeline*, 421 U.S. at 245). The Fourth Circuit also relied on the Supreme Court's observation in *Ruckelshaus* that "virtually every one of the more than 150 existing federal fee-shifting provisions *predicates fee awards on some success by the claimant*" to conclude that a statute mandating fees without regard to a party's success is not a fee-shifting statute governed by the American Rule. *Id.* (quoting *Ruckelshaus*, 463 U.S. at 684).

We respectfully submit that *Shammas*'s holding cannot be squared with the Supreme Court's line of non-prevailing party precedent applying the American Rule. Although *Alyeska Pipeline* does refer to the American Rule in the context of a "prevailing party," the rule is not so limited. Rather, the Supreme Court has consistently applied the rule broadly to any statute that allows fee shifting to either party, win or lose. For example, the Supreme Court in *Hardt* evaluated a request for attorneys' fees under 29 U.S.C. § 1132(g)(1), which grants

courts authority to award "reasonable attorney's fee[s] . . . to either party" at the court's "discretion." 560 U.S. at 251–52. The Supreme Court held that "a fee claimant need not be a 'prevailing party' to be eligible for an attorney's fees award under § 1132(g)(1)" because the statutory text contained no such limitation. *Id.* at 252. But the absence of a "prevailing party" requirement did not render the American Rule inapplicable to the fee-shifting inquiry. Instead, the Court "interpret[ed] § 1132(g)(1) in light of [its] precedents addressing statutory deviations from the American Rule that do not limit attorney's fees awards to the 'prevailing party.'" *Id.* at 254.

Our decision is in keeping with *Ruckelshaus*, relied on by the Fourth Circuit in *Shammas*. While the Court in *Ruckelshaus* acknowledged that the vast majority of fee-shifting provisions impose a "success" requirement, the Court made clear that its absence does not render the American Rule inapplicable. Instead, the Court applied the American Rule even though the district court awarded fees to a "party that achieved no success on the merits" based on a statute that authorized "reasonable attorney . . . fees[] whenever [the court] determines that such an award is appropriate." *Ruckelshaus*, 463 U.S. at 682–85 (emphasis omitted) (quoting 42 U.S.C. § 7607(f)). Accordingly, we think that the Fourth Circuit's reliance on *Ruckelshaus* to support its view that the American Rule does not apply to statutes lacking a success requirement is misplaced.

Our understanding is likewise confirmed by numerous other cases that applied the American Rule to a variety of statutes that did not mention a "prevailing party." The Supreme Court applied the American Rule to a bankruptcy statute allowing "reasonable compensation for actual, necessary services rendered by the trustee . . . or attorney." *Baker Botts*, 135 S. Ct. at 2165 (emphasis omitted). An environmental statute permitting the recovery of any

"necessary costs of response," including "enforcement activities" was also analyzed by the Court under the American Rule. *Key Tronic*, 511 U.S. at 813, 819. So too with a statute authorizing an injured person to "recover the damages by him sustained and the cost of the suit." *Summit Valley*, 456 U.S. at 722. The Court likewise held that the American Rule governed an attorneys' fees request under a statute authorizing the recovery of "sums justly due." *F. D. Rich Co.*, 417 U.S. at 128, 130–31.

The PTO also cites the Supreme Court's decision in *Sebelius v. Cloer*, which interpreted a statute requiring the payment of attorneys' fees regardless of the party's litigation success without expressly discussing the American Rule. 569 U.S. 369 (2013). This, the PTO argues, shows that the American Rule does not apply to statutes that do not refer to a "prevailing party." At issue in *Cloer* was the National Childhood Vaccine Injury Act of 1986 ("NCVIA"). The statute creates an "unusual scheme for compensating attorneys who work on NCVIA petitions": it requires courts to award "reasonable attorneys' fees" for a successful petition, and it grants courts discretion to make the same award for an unsuccessful petition "brought in good faith [with] a reasonable basis for the claim." *Id.* at 373–74 & n.1 (quoting 42 U.S.C. § 300aa-15(e)(1)). Therefore, Congress specifically and explicitly authorized the award of attorneys' fees. The only question for the Court was whether attorneys' fees could be recovered for untimely petitions.

The Court answered this question in the affirmative, but its analysis does not undercut the American Rule's applicability to § 145. First, the Court rejected the government's argument that an untimely petition was ineligible for fees because it was never "filed" within the meaning of the statute. *Id.* at 377–79. The Court then turned to the government's argument that common-law principles, including the American Rule, barred the award of attorneys' fees for untimely petitions. Citing the page

of the government's brief discussing the American Rule, the Court held that the "presumption favoring the retention of long-established and familiar [common-law] principles," i.e., the American Rule, must "give way" to the unambiguous statutory language. *Id.* at 380–81 (alteration in original) (quoting Brief for the Petitioner at 32, *Sebelius v. Cloer*, 569 U.S. 369 (2013) (No. 12-236), 2013 WL 75285, *32). *Cloer* thus stands for the unremarkable principle that a statute providing for the award of "attorneys' fees" can displace the American Rule.

Given the Supreme Court's line of non-prevailing party precedent and the inapposite nature of *Cloer*, we see no reason why the American Rule would not apply to § 145. As the Supreme Court has explained, the American Rule simply provides that each litigant bears its own attorney fees. *Hardt*, 560 U.S. at 253. The PTO's reading of § 145 requires the opposite. Accordingly, § 145 should not escape the heightened standard required for congressional departure from this bedrock principle.

## B

Having concluded that the American Rule applies, we now ask whether § 145 displaces it. The Supreme Court has explained that when, as here, a statutory provision "does not expressly provide for the recovery of attorney's fees . . . we are not presented with a situation where Congress has made 'specific and explicit provisions for the allowance of' such fees." *Summit Valley*, 456 U.S. at 722 (quoting *Alyeska Pipeline*, 421 U.S. at 260 & n.33); *see also Key Tronic*, 511 U.S. at 815. But "[t]he absence of [a] specific reference to attorney's fees is not dispositive if the statute otherwise evinces an intent to provide for such fees." *Key Tronic*, 511 U.S. at 815. Congress can convey this intent through the ordinary meaning of the statutory term alleged to shift attorneys' fees—here, "[a]ll the expenses of the proceedings"—although the ordinary meaning must supply a "specific and explicit" directive to

depart from the American Rule. *See Summit Valley*, 456 U.S. at 722–23; *see also id.* at 721, 726 (declining to deviate from American Rule after finding no "express statutory authorization" in statute's text to support contention that "damages" includes attorneys' fees); *Key Tronic*, 511 U.S. at 819 (requiring "explicit statutory authority" to depart from American Rule).

In our view, § 145's statement that "[a]ll the expenses of the proceedings shall be paid by the applicant" lacks the "specific and explicit" congressional authorization required to displace the American Rule. Section 145 contains no reference to attorneys' fees, "reasonable compensation for actual, necessary services rendered by the . . . attorney," *Baker Botts*, 135 S. Ct. at 2165 (emphasis omitted), PTO attorney salaries, or any other equally clear language. To satisfy the Supreme Court's strict standard, the PTO must show that "[a]ll the expenses of the proceedings" specifically and explicitly includes attorneys' fees. But this phrase is at best ambiguous as to attorneys' fees. As explained below, the cases and definitions relied on by the PTO demonstrate that, at most, this language is merely capable of implicitly covering attorneys' fees. The American Rule and the "specific and explicit" requirement demand more than language that merely *can be* and *is sometimes used* broadly to implicitly cover attorneys' fees. Moreover, other statutory provisions enacted by Congress demonstrate that ordinarily, a statutory right to "expenses" does not include an implicit authorization to award attorneys' fees. This is further demonstrated by both contemporaneous and current court cases and other statutory provisions in the Patent Act.

We begin our analysis with contemporaneous definitions and usages of "expenses." In 1839, when Congress introduced the "whole of the expenses" language in § 145's predecessor, Act of Mar. 3, 1839, § 10, 5 Stat. at 354, the ordinary meaning of "expenses" did not implicitly encompass attorneys' fees. The PTO only cites one dictionary

from this time period, which defined "expense" as "[a] laying out or expending; the disbursing of money, or the employment and consumption, as of time or labor." Appellant Br. 17 (quoting Noah Webster, *American Dictionary of the English Language* (1st ed. 1828)). Other 1830s dictionaries defined "expense" as "cost; charges; money expended," J.E. Worcester, *A Comprehensive Pronouncing and Explanatory Dictionary of the English Language, with Pronouncing Vocabularies of Classical and Scripture Proper Names* 117 (1830), and as "the disbursing of money," "[m]oney expended," "cost," and "[t]hat which is used, employed, laid out, or consumed," Noah Webster et al., *An American Dictionary of the English Language* 319 (Joseph Worcester ed., 1830). These vague definitions, however, do not establish that a statutory right to "expenses" includes "an implicit authorization to award attorney's fees." *Summit Valley*, 456 U.S. at 722.

More compelling than the dictionary definitions, though, is Congress's usage of the terms "expenses" and "attorneys' fees" in other statutes. These statutes demonstrate Congress's understanding that the ordinary meaning of "expenses" does not include attorneys' fees. Similar to the Supreme Court's analysis in *West Virginia University Hospitals, Inc. v. Casey*, we think the "record of statutory usage" convincingly demonstrates that attorneys' fees and expenses are regarded as separate elements unless specifically identified otherwise. 499 U.S. 83, 88 (1991) (reviewing statutes using terms "attorney's fees" and "expert fees" to understand whether reference to "attorney's fees" would necessarily shift expert fees as well).

Indeed, Congress has drafted numerous statutes authorizing the award of both "expenses" and "attorneys' fees." This first category of statutes list expenses and attorneys' fees as separate items of recovery. *See, e.g.*, 11 U.S.C. § 363(n) (authorizing trustee to recover "any costs, attorneys' fees, or expenses incurred" in certain

situations); 12 U.S.C. § 1464(d)(1)(B)(vii) ("[C]ourt . . . may allow to any such party reasonable expenses and attorneys' fees."); 12 U.S.C. § 1786(p) ("[C]ourt . . . may allow to any such party such reasonable expenses and attorneys' fees as it deems just and proper . . . ."); 25 U.S.C. § 1401(a) (discussing "payment of attorney fees and litigation expenses"); 26 U.S.C. § 6673(a)(2)(A) (allowing recovery of "excess costs, expenses, and attorneys' fees" against attorney who vexatiously multiplied proceedings); 15 U.S.C. § 77z-1(a)(6) (discussing "[t]otal attorneys' fees and expenses" that can be awarded by court); 31 U.S.C. § 3730(d)(1) ("Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."); 38 U.S.C. § 4323(h)(2) ("[T]he court may award any such person who prevails in such action or proceeding reasonable attorney fees, expert witness fees, and other litigation expenses."); Act of Dec. 23, 1930, ch. 23, § 4, 46 Stat. 1033, 1034 (granting Court of Claims jurisdiction to "determine a reasonable fee . . . to be paid the attorney or attorneys employed as herein provided, together with all necessary and proper expenses"); Act of Mar. 23, 1932, ch. 90, § 7, 47 Stat. 70, 72 (requiring adequate security to cover "all reasonable costs (together with a reasonable attorney's fee) and expense" before permitting issuance of temporary restraining order or temporary injunction). It is hard to imagine that the ordinary meaning of "expenses" specifically and explicitly includes "attorneys' fees" given the volume of statutory provisions that treat expenses and attorneys' fees as separate items.[4] If "expenses" includes

---

[4] The dissent questions the import of these statutes because they post-date the enactment of § 145's predecessor. Dissent Op. 6–7 n.1. But Congress distinguished between attorneys' fees and expenses during the mid-1800s too, *see, e.g.*, S.J. Res. 25, 40th Cong. § 1, 15 Stat.

attorneys' fees, then many "statutes referring to the two separately become an inexplicable exercise in redundancy." *W. Va. Univ.*, 499 U.S. at 92.

A second category of statutes define expenses to include attorneys' fees, but they do so explicitly. These statutes demonstrate that "expenses" does not necessarily include attorneys' fees, else there would be no need to so define "expenses." *See, e.g.,* 12 U.S.C. § 5005(b)(2)(B) (providing that, in absence of breach of warranty, amount of indemnity shall be sum of "interest and expenses (including costs and reasonable attorney's fees and other expenses of representation)"); 10 U.S.C. § 2409(c)(1)(C) (permitting agency head to require that contractor pay "an amount equal to the aggregate amount of all costs and expenses (including attorneys' fees and expert witnesses' fees)" in connection with complaint regarding a reprisal); 15 U.S.C. § 2310(d)(2) (permitting recovery of "a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended)"); 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."); 29 U.S.C. § 1370(e)(1) ("[T]he court in its discretion may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees . . . ."); 30 U.S.C. § 938(c) (allowing successful miner to recover "a sum equal to the aggregate amount of all costs and expenses (including the attorney's fees)"); 33 U.S.C. § 1367(c) ("[A] sum equal to the aggregate amount of all costs and expenses (including

---

26, 26 (1867) (discussing payment to "agent or attorney [of] his lawful fees and expenses"). In any event, neither the PTO nor the dissent suggests that Congress's understanding in this regard changed between 1839 and the passage of the above-cited statutes.

the attorney's fees) . . . shall be assessed . . . ."); 41 U.S.C. § 4705(d)(1)(C) (noting that head of agency may "[o]rder the contractor to pay the complainant an amount equal to the aggregate amount of all costs and expenses (including attorneys' fees and expert witnesses' fees) that the complainant reasonably incurred"); 42 U.S.C. § 247d-6d(e)(9) (permitting party to recover "reasonable expenses incurred . . . including a reasonable attorney's fee"); 2 U.S.C. § 396 ("The committee may allow any party reimbursement from the applicable accounts of the House of Representatives of his reasonable expenses of the contested election case, including reasonable attorneys fees . . . .").

Collectively, these statutes encompass diverse categories of legislation and demonstrate that Congress understood the "ordinary, contemporary, common meaning" of "expenses" as being something other than "attorneys' fees" unless expressly specified. *See Summit Valley*, 456 U.S. at 722 (quoting *Perrin*, 444 U.S. at 42). Statutes awarding both expenses and attorneys' fees suggest that Congress viewed them as distinct tools in its toolbox of recovery items that can be shifted at its discretion to accomplish a policy objective. If "expenses" necessarily included "attorneys' fees," the numerous statutes providing for both would have superfluous words and, as a general rule, courts should "avoid an interpretation of a statute that 'renders some words altogether redundant.'" *See United States v. Alaska*, 521 U.S. 1, 59 (1997) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995)). Likewise, Congress would have no reason to permit the recovery of "expenses"—and then specify whether it included "attorneys' fees"—if the former always encompassed the latter. To us, the logical implication of Congress's prior usage is that "attorneys' fees" are not even ordinarily, let alone necessarily, included in "expenses" absent an express expansion of "expenses" to include "attorneys' fees." At best, whether "expenses" includes "attorneys' fees" is

ambiguous.[5]  But ambiguity cannot satisfy the exacting standard erected by the American Rule for shifting attorneys' fees.

In considering whether the ordinary meaning of a particular statutory provision shifted attorneys' fees, the Supreme Court in *Key Tronic* found it persuasive that Congress included express provisions for fee awards in related statutes without including a similar provision in the statute at issue.  511 U.S. at 817–18.  So too here.[6]

---

[5]    We note that § 145 is not discretionary; it requires that "[a]ll the expenses of the proceedings *shall* be paid by the applicant."  35 U.S.C. § 145 (emphasis added).  To the extent the phrase "expenses" unambiguously includes attorneys' fees, it is unclear why it took the PTO more than 170 years to appreciate the statute's alleged clarity and seek the attorneys' fees that are statutorily mandated under its interpretation.  The dissent excuses the PTO's failure to pursue fees in earlier proceedings, citing "dramatic[]" changes in the patent landscape, Dissent Op. 18, but this does nothing to soften the statute's mandatory directive.

[6]    The dissent cites *Key Tronic* as an example of the Supreme Court favorably citing the Eighth Circuit's conclusion that a statute's reference to "necessary costs of response" and "enforcement activities" constituted a "sufficient degree of explicitness" to permit the award of attorneys' fees.  Dissent Op. 15 (quoting *Key Tronic*, 511 U.S. at 815).  But the Supreme Court analyzed the same statutory language as the Eighth Circuit and held that it cannot support an award of attorneys' fees: "To conclude that a provision that only impliedly authorizes suit nonetheless provides for attorney's fees with the clarity required by *Alyeska* would be unusual if not unprecedented."  *Key Tronic*, 511 U.S. at 818.  This decision was informed in part by the presence of "two express

The existence of several Patent Act provisions awarding "attorneys' fees" demonstrates Congress's use of "specific and explicit" language in the Patent Act to shift fees when it so desired. For example, § 285 states: "The court in exceptional cases may award reasonable *attorney fees* to the prevailing party." 35 U.S.C. § 285 (emphasis added). Other provisions of the Patent Act recognize the availability of attorneys' fees by cross-referencing § 285. *See, e.g.*, 35 U.S.C. § 271(e)(4) (noting "that a court may award *attorney fees* under section 285" as part of remedy for infringement under § 271(e)(2) (emphasis added)); 35 U.S.C. § 273(f) (listing circumstances where "the court shall find the case exceptional for the purpose of awarding *attorney fees* under section 285" (emphasis added)). Finally, § 297(b)(1) permits customers who have been defrauded by an invention promoter to recover "reasonable costs and *attorneys' fees*" in addition to damages. 35 U.S.C. § 297(b)(1) (emphasis added).

Congress elected in § 145 to provide for the recovery of the PTO's "expenses," not its "attorneys' fees." When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). Here, Congress did not award "attorneys' fees" under § 145 but did make them available under other sections of the Patent Act. We presume this was intentional, *id.*, and thus the omission of "attorneys' fees" from § 145 "strongly suggest[s] a deliberate decision not to authorize such awards." *See Key Tronic*, 511 U.S. at 819

---

provisions for fee awards" in a related statute, which the Court understood to "strongly suggest a deliberate decision not to authorize such awards" here. *Id.* at 818–19.

(declining to award fees under provision that did not refer to "attorneys' fees," in part because two other provisions in related statute contained express authority to shift fees).[7] We are dubious of the dissent's attempt to distinguish § 285 from § 145 on the ground that § 145 does not "arise[] in traditional patent litigation." Dissent Op. 8. To the contrary, § 145 is titled "Civil action to obtain patent," and it provides "remedy by civil action against the Director in the United States District Court for the Eastern District of Virginia." § 145. This statutory language clearly gives rise to "patent litigation" between the disappointed patent applicant and the Director of the PTO.

We have also considered judicial usage of "expenses." *See W. Va. Univ.*, 499 U.S. at 92–93 (looking to contemporaneous court decisions to determine whether expert fees

---

[7] The patent laws have been amended on numerous occasions since Congress enacted § 145's predecessor in 1839. If the PTO's decision not to seek fees during this time contradicted Congress's intent, Congress could have revised the statute to make its intent more clear. For example, Congress amended the law in 1946 to permit the "award [of] reasonable *attorney's fees* to the prevailing party" in infringement actions. Act of Aug. 1, 1946, ch. 726, 60 Stat. 778, 778 (emphasis added) (creating predecessor to § 285). Congress could have included similar language in § 145, but it did not. "When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009). Although *Gross* drew this inference based on Congress's decision to amend a provision in one statute but not amend a similar provision in another statute, we think the inference carries equal force with respect to two provisions within the same statutory scheme.

were shifted as element of attorneys' fees). Many courts and litigants in the 1800s referred to "expenses" and "attorneys' fees" as distinct items. *See, e.g.*, *Morris v. Way*, 16 Ohio 469, 472 (1847) (referring to statement of accounts listing "attorney's fees and expenses"); *Hayden v. Sample*, 10 Mo. 215, 221 (1846) (noting defendant's request that jury be instructed to ignore evidence of "the expenses incurred . . . and the fees paid counsel and attorneys"); *Anderson v. Farns*, 7 Blackf. 343, 343 (Ind. 1845) (citing party's request for indemnity from all "penalties, costs, damages, attorney's fees, and expenses"); *State v. Williams*, 13 Ohio 495, 499 (1844) (providing that trustees had authority to settle "the expense of prosecuting suits, attorney's fees, etc."); *Bishop v. Day*, 13 Vt. 81, 83 (1841) (discussing contract containing indemnity from "any costs, lawyers' fees, and expenses"); *Hickman v. Quinn*, 14 Tenn. 96, 107 n.1 (1834) (explaining that defendants deducted "their expenses, attorney's fees, etc." from amount voluntarily given to plaintiff); *see also* Br. of Amici Curiae Intellectual Prop. Owners Ass'n 8 (collecting cases).

This distinction remains evident in recent legal opinions. For example, one court recognized that "[t]he terms 'costs' or 'expenses' when used in a statute do not ordinarily include attorney's fees." *Ark. Dep't of Human Servs., Div. of Econ. & Med. Servs. v. Kistler*, 320 Ark. 501, 509 (1995); *see also Tracy v. T & B Constr. Co.*, 182 N.W.2d 320, 322 (S.D. 1970) ("Ordinarily the terms 'costs' and 'expenses' as used in a statute are not understood to include attorney's fees."); *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 776 (3d Cir. 1990) ("[W]e can not find the vague reference in § 4-207(3) to 'expenses' [to be a] sufficient basis on which to predicate such an award [of attorneys' fees]."); *Lewis v. Pension Benefit Guar. Corp.*, 197 F. Supp. 3d 16, 29 (D.D.C. 2016) (finding no authority to shift attorneys' fees under 29 U.S.C. § 1303(f), subsection (3) of which permits court to "award all or a portion of

the costs and expenses incurred in connection with such action").

Finally, we emphasize that the PTO's interpretation of § 145 would have a patent applicant pay the government's attorneys' fees even when the patent applicant succeeds. Other than what we believe to be an incorrect interpretation of the trademark analogue in *Shammas*, we are aware of no statute that requires a private litigant to pay the government's attorneys' fees without regard to the party's success in the litigation. Indeed, the PTO could not identify any statute that shifts the salaries of an agency's attorneys onto the party bringing suit to challenge the agency's decision. *See* Oral Arg. at 26:53–27:09, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 16-1794_382018.mp3; *see also* Br. of Amici Curiae Am. Bar Ass'n 5 ("Congress has never enacted a fee-shifting provision that shifts only the government's fees onto private parties, much less a provision that does so even if the government loses the litigation."). Thus, adopting the PTO's interpretation would create a particularly unusual divergence from the American Rule. Had Congress intended to produce such an anomalous result, we believe "it would have said so in far plainer language than that employed here." *Ruckelshaus*, 463 U.S. at 694.

The Supreme Court's reluctance to endorse statutory interpretations that would create sweeping departures from the American Rule furthers our conclusion. For example, even in statutes where Congress has granted courts broad leeway to shift "attorneys' fees," the Supreme Court has restricted the availability of those awards. *See, e.g.*, *Hardt*, 560 U.S. at 251–52, 255 (requiring "some degree of success on the merits" to recover attorneys' fees even though statute permits "court in its *discretion* [to] allow a reasonable attorney's fee and costs of action *to either party*" (emphases added)); *Ruckelshaus*, 463 U.S. at 682–83, 694 (requiring "some degree of success on the merits" before shifting attorneys' fees even though statute

allows court to "award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such an award is *appropriate*" (emphasis added)); *Baker Botts*, 135 S. Ct. at 2165 (permitting recovery of attorneys' fees for work done during bankruptcy proceeding, but not in fee-defense litigation, under statute allowing "reasonable compensation for actual, necessary services rendered by the trustee . . . or attorney" (emphasis omitted)).

And the Court often rejects fee-shifting requests under the American Rule where Congress employs vague statutory language that might, to a layperson, seem broad enough to cover attorneys' fees as well as other items. *See, e.g.*, *Summit Valley*, 456 U.S. at 722, 726 (declining to shift attorneys' fees under statute permitting recovery of "the damages by him sustained and the cost of the suit"); *F. D. Rich Co.*, 417 U.S. at 128, 130–31 (declining to award attorneys' fees pursuant to statute authorizing recovery of "sums justly due"); *Fleischmann*, 386 U.S. at 720 (declining to award attorneys' fees under statute giving courts authority to award "costs of the action"); *Key Tronic*, 511 U.S. at 813, 819 (declining to shift attorneys' fees pursuant to statute making responsible parties liable for "any . . . necessary costs of response," including "enforcement activities"). Using these cases as a barometer, we cannot conclude that a statute awarding "[a]ll the expenses," with nothing more, effects such an extreme departure from the American Rule.

IV

The PTO and the dissent resist our conclusion that § 145 does not displace the American Rule. They both begin—as we do—with the meaning of "expenses." To support an expansive reading of "expenses" that includes attorney fees, the PTO and the dissent cite the Supreme Court's statement in *Taniguchi* that "[t]axable costs are a fraction of the nontaxable *expenses borne by litigants for*

*attorneys*, experts, consultants, and investigators." 566 U.S. at 573 (emphasis added); *see generally* Appellant Br. 38–39; Dissent Op. 6.  We acknowledge that the word "expenses" is broad and, like "costs" or "litigation costs," is sometimes used in judicial opinions to refer to a variety of burdens incurred by a litigant, including attorneys' fees. But the Supreme Court has never interpreted the phrase "expenses" or "all the expenses" to authorize a departure from the American Rule.  Indeed, *Taniguchi* only analyzed "whether [the phrase] 'compensation of interpreters' covers the cost of translating documents."  *Id.* at 562.

In a similar vein, the PTO relies on a single sentence from *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006).  *See* Appellant Br. 39. There, the Individuals with Disabilities Education Act ("IDEA") permitted courts, in their discretion, to award "reasonable attorneys' fees as part of the costs" to the prevailing party.  *Arlington Central*, 548 U.S. at 297 (quoting 20 U.S.C. § 1415(i)(3)(B)).  Respondents asserted that "costs" should be interpreted to cover all the costs of an IDEA proceeding, including expert fees.  The Court rejected respondents' argument, noting that the statute's "use of this term of art ['costs'], rather than a term such as 'expenses,' strongly suggests that § 1415(i)(3)(B) was not meant to be an open-ended provision that makes participating States liable for all expenses incurred."  *Id.*  The PTO seizes on this language, but it omits the end of the sentence, which provides examples of the "open-ended . . . expenses" envisioned by the Court: "travel and lodging expenses or lost wages due to time taken off from work." *Id.*  Absent from the list is a reference to attorneys' fees. Thus, *Arlington Central* does not address the interpretation of a statute containing the word "expenses" in light of the American Rule.  Nor does it stand for the proposition that the ordinary meaning of "expenses" is broad enough to include "attorneys' fees."

The PTO likewise insists that a single sentence in *Baker Botts* suggests that a statutory reference to "litigation costs" alone would suffice to shift attorneys' fees. Appellant Br. 39 (quoting 135 S. Ct. at 2164). Specifically, the Court in *Baker Botts* stated: "We have recognized departures from the American Rule" and these departures "tend to authorize the award of 'a reasonable attorney's fee,' 'fees,' or 'litigation costs,' and usually refer to a 'prevailing party.'" *Id.* But none of the cited statutes—either in *Baker Botts* itself or in the cases *Baker Botts* cites—contain a stand-alone reference to "litigation costs." *See* Appellee Br. 24–25. Rather, each of the statutes expressly provides for the award of attorneys' fees in addition to, or as part of, the litigation costs. We therefore do not read *Baker Botts* to stand for the proposition that the phrase "litigation costs," by itself, can displace the American Rule.[8]

---

[8]   *Alyeska Pipeline* also cited numerous statutory examples of "specific and explicit provisions for the allowance of attorneys' fees." 421 U.S. at 260–62 & n.33–35. Again, every cited statute referred to either "fees," "attorneys' fees," or "reasonable compensation for services rendered" by an "attorney." *See id.* The same holds true for the 2008 Congressional Research Service Report in which Congress compiled the text of several hundred other fee-shifting provisions. Each of these statutes referred to "attorneys' fees," "fees," "compensation for . . . attorney[s]," "fees for attorneys," "compensation for representation . . . equivalent to that provided for court-appointed representation," "fees of counsel," "legal fees," or "compensation" for "foreign counsel." Henry Cohen, Cong. Research Serv., *Awards of Attorneys' Fees by Federal Courts and Federal Agencies* 64–114 (2008), *available at* https://fas.org/sgp/crs/misc/94-970.pdf. Notably, § 145 was not included in the statutory compilation.

The PTO and dissent next accuse us of transforming a statute requiring the payment of "[a]ll the expenses" to one demanding reimbursement for only "some" of the expenses. Appellant Br. 41; *see* Dissent Op. 9–10. Both emphasize the modifier "[a]ll" in arguing that Congress intended § 145 to be fully remedial. But the word "all" sheds no light on the breadth of "expenses" vis-à-vis attorneys' fees—the crux of the dispute—and serves only to clarify that, whatever the "expenses" are, all of them must be paid by the applicant. In addition, at least one statute expressly identifies "attorneys' fees" as one of an enumerated list of "all expenses" recoverable, further supporting the notion that the phrase "all expenses" does not carry the weight afforded to it by the PTO and the dissent. *See* 50 U.S.C. § 4531(b)(4) (permitting recovery of "all expenses and losses incurred . . . including . . . attorneys' fees and expenses of litigation"). Finally, we note that, even if "attorney's fees are necessary to achieve *full* compensation [for the PTO's involvement in a § 145 action], this justification alone is not sufficient to create an exception to the American Rule in the absence of express congressional authority." *Summit Valley*, 456 U.S. at 724 (emphasis added). The argument by the PTO is "nothing more than a 'restate[ment] of one of the oft-repeated criticisms of the American Rule.'" *Id.* at 725 (alteration in original) (quoting *F. D. Rich Co.*, 417 U.S. at 128).

The dissent next invokes "legislative history and the purpose of § 145" for displacing the American Rule. Dissent Op. 10–13. At the outset, we question the role of legislative history in this context where the very point of the "specific and explicit" standard is to demand clarity in the statute's text. *See Baker Botts*, 135 S. Ct. at 2164 ("We have recognized departures from the American Rule only in 'specific and explicit provisions for the allowance of attorneys' fees under selected statutes.'" (quoting *Alyeska Pipeline*, 421 U.S. at 260)); *cf. Conroy v. Aniskoff*,

507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("The law as it passed is the will of the majority of both houses, *and the only mode in which that will is spoken is in the act itself . . . .*" (emphasis in original) (quoting *Aldridge v. Williams,* 44 U.S. (3 How.) 9, 24 (1844))). Where the textual indications are unclear, we are skeptical of what legislative history and policy could add to satisfy this standard. But even if we set these concerns aside, the dissent's legislative history fails to advance its interpretation of § 145.

The dissent points to an expense reimbursement provision in the 1870 amendments to the patent laws, which it notes is similar to the language employed by Congress in § 145's predecessor. Dissent Op. 11. Initial versions of the House bill limited the reimbursement by using the word "costs" and capping it at $25. *See* H.R. 1714, 41st Cong. § 52 (as passed by House, Apr. 25, 1870). The Senate, however, changed "costs" to "expenses" and removed the $25 cap. *See* H.R. 1714, 41st Cong. § 52 (as amended by Senate, May 31, 1870). The enacted version reflects the Senate amendments, *see* Act of July 8, 1870, ch. 230, § 52, 16 Stat. 198, 205, which according to the dissent, "demonstrates—or at least strongly suggests— that Congress specifically intended that 'expenses' be broader than 'costs.'" Dissent Op. 12. We do not contest that "expenses" is broader than "costs." But the breadth of expenses relative to costs has no relevance here. Our task is to determine whether "expenses" includes attorneys' fees, and the dissent's legislative history is silent on this crucial point.

The PTO and the dissent also direct our attention to § 9 of the 1836 patent statute—a budgetary provision that uses the word "expenses." Appellant Br. 27–28; Dissent Op. 4. Section 9 requires that money paid by patent applicants into the Treasury be used "for the payment of the salaries of the officers and clerks herein provided for, and all other expenses of the Patent Office." Act of July 4,

1836, ch. 357, § 9, 5 Stat. 117, 121.  In the dissent's view, this establishes that Congress "understood salaries to be within the scope of 'expenses.'"  Dissent Op. 4.  But as the dissent recognizes, context is important when interpreting a statute.  Dissent Op. 7.  Here, § 9 is an accounting provision that earmarks money the PTO receives to cover various "expenses of the Patent Office"; it does not address how "expenses of the proceedings" are to be allocated in the context of adversarial litigation involving the PTO.  Moreover, it is doubtful (or at least uncertain) whether any of the salaries of the particular "officers and clerks *herein provided for*" under § 9 included the salaries of PTO attorneys and paralegals who engaged in litigation on the agency's behalf.  § 9, 5 Stat. at 121 (emphasis added); *see id.* §§ 1–2, 5 Stat. at 117–18 (creating roles for Commissioner of Patents, Chief Clerk of Patent Office, an examining clerk, and two "other" clerks).  Accordingly, § 9 at most supports the idea that "expenses" *can be* broad enough to cover salaries of some PTO employees in an unrelated context.  But, even then, Congress felt it necessary to expressly enumerate "salaries of the officers and clerks" in addition to "all other expenses," demonstrating again that the ordinary meaning of expenses does not include attorney salaries.

Both the dissent and the PTO contend that it would not make sense for Congress to use the phrase "attorneys' fees" in the context of § 145 actions because it is more accurate to classify the salaries of the PTO's attorneys as personnel "expenses."  Appellant Br. 42; Dissent Op. 8.  In light of other statutes providing for the government's recoupment of *attorneys' fees*, as opposed to personnel expenses, in enforcement actions, we do not find this argument convincing.  *See, e.g.,* 42 U.S.C. § 7413(d)(5) ("Any person who fails to pay on a timely basis a civil penalty ordered or assessed under this section shall be required to pay . . . the United States enforcement expenses, including but not limited to attorneys fees and

costs incurred by the United States for collection proceedings . . . ."); 33 U.S.C. § 1319(g)(9) (similar). Indeed, aside from the trademark analogue at issue in *Shammas*, the PTO did not identify a single statute that awards to the government prorated portions of its attorneys' salaries without using the phrase "attorneys' fees."

Finally, the PTO and the dissent paint § 145 actions as a scourge on other patent applicants. Appellant Br. 21–25; Dissent Op. 12, 17–18. They claim it is unfair to burden all applicants with the additional costs caused by those who voluntarily initiate § 145 proceedings. But this policy debate on the value of § 145 actions is best left for Congress. And, as various amici indicate, Congress already addressed the debate by rebuffing an attempt to repeal § 145. Br. of Amici Curiae Intellectual Prop. Owners Ass'n 21 n.3; Br. of Amici Curiae Ass'n of Amicus Counsel 14. In any event, the dissent's concerns appear to us exaggerated. A back-of-the-envelope calculation elucidates the minuscule impact of these proceedings on the overall cost of a patent application. Although neither party could provide an exact tally of the § 145 proceedings, at the panel stage the PTO estimated that there were four to five of these proceedings in the last three years. *See* Oral Arg. at 19:19–20:10, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 16-1794.mp3. If we were to take a conservative estimate of ten § 145 actions per year (five times the rate estimated by the PTO) and assume that the PTO expended $100,000 in attorneys' fees defending each action ($20,000 more than the amount the PTO incurred in this case), the total expense for fiscal year 2018 would be $1 million. The PTO estimates that it will receive more than 627,000 patent applications during this same time period. *See* U.S. Patent and Trademark Office, *Fiscal Year 2018 Congressional Justification* 11 (2017), https://www.uspto.gov/sites/default/files/documents/fy18p br.pdf. When spread amongst the 627,000+ applications,

the $1 million price tag amounts to less than $1.60 per application.

## V

The general rule in the United States is that each party pays for its own attorneys.  To deviate from the status quo embodied in the American Rule, Congress must draft legislation—"specific and explicit" legislation—demonstrating its intent to make the award of attorneys' fees available under that statute.  Awarding "[a]ll the expenses" simply cannot supply the "specific and explicit" directive from Congress to shift attorneys' fees, and nothing else in the statute evinces congressional intent to make them available.  Other than *Shammas*'s interpretation of the trademark analogue, we are not aware of any statute requiring a private litigant to pay the government's attorneys' fees without regard to the party's success in the litigation.  We are unwilling to "invade the legislature's province by redistributing litigation costs" in a way that would create such an anomalous statute here. *See Alyeska Pipeline*, 421 U.S. at 271.  The judgment of the district court is affirmed.

**AFFIRMED**

Costs

Costs to Appellee.

# United States Court of Appeals for the Federal Circuit

---

**NANTKWEST, INC.,**
*Plaintiff-Appellee*

**v.**

**ANDREI IANCU, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**
*Defendant-Appellant*

---

2016-1794

---

Appeal from the United States District Court for the Eastern District of Virginia in No. 1:13-cv-01566-GBL-TCB, Judge Gerald Bruce Lee.

---

PROST, *Chief Judge*, dissenting, with whom DYK, REYNA, and HUGHES, *Circuit Judges*, join.

The question for the en banc court is whether 35 U.S.C. § 145, which provides that "[a]ll the expenses of the proceedings shall be paid by the applicant," requires the applicant to pay *all* the expenses of the proceedings, including the PTO's personnel expenses, or just *some* of the expenses. When Congress said, "[a]ll the expenses," I believe it meant *all* the expenses. The Fourth Circuit agrees. *Shammas v. Focarino*, 784 F.3d 219 (4th Cir. 2015), *cert. denied sub nom. Shammas v. Hirshfeld*, 136 S.

Ct. 1376 (2016).  The majority opinion creates an unfortunate and unnecessary conflict between the circuits.  I respectfully dissent.

I

When electing to pursue its § 145 action, NantKwest, a disappointed patent applicant, had two options for judicial review of the Patent Trial and Appeal Board's decision.  *See Kappos v. Hyatt*, 566 U.S. 431, 434 (2012).  NantKwest could have "either:  (1) appeal[ed] the decision directly to [this court], pursuant to § 141; or (2) file[d] a civil action against the Director of the PTO in the United States District Court for the [Eastern District of Virginia] pursuant to § 145."  *Id.* at 434 & n.1.  Litigation in district court is expensive and time-consuming, much more so than direct appeals to this court limited to the administrative record.  Section 145, unlike § 141, requires the applicant to pay "[a]ll the expenses of the proceedings," 35 U.S.C. § 145, "regardless of the outcome," *Hyatt v. Kappos*, 625 F.3d 1320, 1337 (Fed. Cir. 2010) (en banc), *aff'd and remanded*, 566 U.S. 431 (2012).  Section 145 actions are also uncommon.  *Id.* (noting that "the vast majority of applicants pursue an on-the-record appeal [under § 141] instead of a § 145 action").

In defending the § 145 proceedings initiated by NantKwest, the PTO incurred expenses for expert witnesses and personnel expenses—that is, the expense of diverting agency attorneys and paralegals from other matters to this § 145 action.  The district court ordered NantKwest to reimburse the agency's expenses for its expert witness but not its personnel.  The parties do not dispute that "[a]ll the expenses of the proceedings" includes the PTO's expert witness expenses.  On appeal, the PTO seeks reimbursement under § 145 for personnel expenses it incurred.

## II

I start, as I must, with the language of the statute. *E.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). And its plain text provides our answer. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018). When § 145 says "[a]ll the expenses of the proceedings shall be paid by the applicant" it means the applicant must pay *all* the expenses of the proceedings. "Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says." *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016). Here, neither the majority opinion nor NantKwest's arguments give me any reason to doubt what I see as the plain-text result in this case. *Id.*

### A

Initially, I note that the PTO did not retain outside counsel to assist in defending this § 145 action. Instead, it used its salaried government lawyers. These lawyers incurred expenses because the time they devoted to this case was not available for other work. *See Wis. v. Hotline Indus., Inc.*, 236 F.3d 363, 365 (7th Cir. 2000) ("[S]alaried government lawyers, like in-house and non-profit counsel, do incur expenses if the time and resources they devote to one case are not available for other work."). Additionally, the PTO is not seeking reimbursement for its lawyers' time at market rate. Rather, the PTO seeks personnel expenses it *actually* incurred in these proceedings. *Compare* J.A. 83–84 (the PTO's request for the actual expenses it incurred in this § 145 action by calculating a proportional share of its attorneys' salaries (citing *Hotline Indus.*, 236 F.3d at 368)), *with, e.g.*, *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 933 (Fed. Cir. 2000) ("[A] non-profit legal services organization is entitled to receive a prevailing market rate pursuant to a statute that authorizes the prevailing party to be awarded 'a reasonable

attorney[s'] fee as part of the cost.'" (citing *Blum v. Stenson*, 465 U.S. 886, 894–96 (1984)).

Thus, the question in this case is whether "[a]ll the expenses of the proceedings" includes the personnel expenses the PTO actually incurred for attorneys in defending these § 145 proceedings.  I conclude that it does.

B

To determine whether the phrase "[a]ll the expenses" includes the PTO's personnel expenses, I first look to the meaning of "expenses."  Although the statute does not expressly define that term, the Patent Act of 1836 did use the term "expenses" in a provision discussing application fees.  That provision, which was retained when Congress added the expense-reimbursement language in 1839, read in relevant part:

> [T]he applicant shall pay into the Treasury of the United States, or into the Patent Office, or into any of the deposite banks to the credit of the Treasury . . . the sum of thirty dollars . . . . And the moneys received into the Treasury under this act shall constitute a fund for the payment of the *salaries of the officers and clerks herein provided for, and all other expenses of the Patent Office*, and to be called the patent fund.

Patent Act of 1836, ch. 357, § 9, 5 Stat. 117, 121 (emphasis added).  Congress understood "salaries of the officers and clerks" as one kind of "expense."  To be sure, there is a difference between "expenses of the Patent Office" and "expenses of the proceedings," but the point is that Congress, at the time it enacted the precursor to § 145, understood salaries to be within the scope of "expenses."

When a term goes undefined in a statute, we give the term its ordinary meaning.  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  The ordinary mean-

ing of "expenses" encompasses expenditures for personnel. Dictionaries in use when Congress enacted § 145's precursor generally defined "expenses" as an expenditure of money, time, labor, or resources. For example, in 1830 "expense" was defined as "1. [a] laying out or expending; the disbursing of money, or *the employment and consumption, as of time or labor*." Noah Webster, *An American Dictionary of the English Language* 319 (3d ed. 1830) (emphasis added). The majority points to other 1830s dictionary definitions, which defined "expense" as "cost; charges; money expended," J.E. Worcester, *A Comprehensive Pronouncing and Explanatory Dictionary of the English Language, with Pronouncing Vocabularies of Classical and Scripture Proper Names* 117 (1830), and as "the disbursing of money," "2. Money expended," "cost," and "3. That which is used, employed, laid out or consumed," Noah Webster, *An American Dictionary of the English Language* 319 (3d ed. 1830). Based on these definitions, I agree with the government that the ordinary or common meaning of "expenses" includes personnel expenditures. It also includes out-of-pocket attorneys' fees.

Although the PTO did not retain outside counsel in this case, the statute's history suggests that Congress intended "expenses" to also include attorneys' fees for the PTO's retained outside counsel. At the time the expense-reimbursement provision appeared, proceedings in equity seem to have been quite rare. And when they occurred, it seems that the PTO incurred the expense of employing outside counsel. This conclusion is drawn from the Report of the Commissioner of Patents for the Year 1845, in which the Commissioner explained that "[t]wo suits in equity are now pending against the Commissioner in the circuit court for the district of Pennsylvania, in which, as it has not been necessary for me to attend, I have employed counsel." REPORT OF THE COMMISSIONER OF

PATENTS FOR THE YEAR 1845, H. Doc. No. 29-140, at 8 (1st Sess. 1846).

The plain and ordinary meaning that the Supreme Court has ascribed to the word "expenses" comports with my reading of the dictionary definitions cited above. For example, the Court has recognized that "expenses" (as compared to taxable costs) contemplates the full range of expenditures a party must make in litigation (including attorneys). *Taniguchi*, 566 U.S. at 573 ("Taxable costs are a fraction of the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators."). In other words, the Supreme Court has told us that the plain and ordinary meaning of the word "expenses" in the litigation context includes those incurred for attorneys.

Although NantKwest and the majority do not deny that "expenses" is broad enough to cover the PTO's personnel expenses, they contend that the term "is merely capable of implicitly covering attorneys' fees" and "is at best ambiguous as to attorneys' fees." Majority Op. 17. As support, NantKwest and the majority rely on other federal statutes under various titles where Congress has employed the term "expenses" to authorize attorneys' fees either in addition to expenses (e.g., "expenses *and* attorneys' fees"), or as a component of them (e.g., "expenses *including* attorneys' fees").[1] The majority contends that

---

[1]     When the Supreme Court examines the "record of statutory usage" it focuses on contemporaneous statutes. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88 (1991) (reviewing statutes enacted the same year as the statute at issue, and in one case a statute enacted "just over a week prior"); *see also id.* at 88–89 & n.4 (reviewing statutes enacted within a few years of the statute at issue). The majority acknowledges that its cited statutes were not enacted contemporaneously with Congress's

"[t]hese statutes demonstrate Congress's understanding that the ordinary meaning of 'expenses' does not include attorneys' fees." Majority Op. 18.

Certainly, "a definition [being] broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi*, 566 U.S. at 568. But even if I were to agree with NantKwest and the majority's characterization of what "expenses" *ordinarily* means, here the statutory context in which "expenses" appears indicates that it includes personnel expenditures for attorneys. *See id.* at 569 (observing that the context in which a word appears may over-override the word's ordinary meaning). As noted, the word "expenses" showed up one other time in the Patent Act of 1836—where the Act expressly characterized the salaries of PTO officers and clerks as "expenses." Patent Act of 1836, ch. 357, § 9, 5 Stat. 117, 121.

The majority addresses the statutory context by pointing to 35 U.S.C. § 285, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The majority suggests that because this provision of the Patent Act specifically mentions attorneys' fees, Congress must have intended to exclude them from "expenses" in § 145. Majority Op. 22–24. I disagree.

---

enactment of § 145's precursor, so it points to an 1867 statute that distinguishes between an individual attorney's fees and his or her expenses. Majority Op. 19 n.4. This distinction hardly suggests that "[a]ll the expenses of the proceedings" does not include the PTO's personnel expenses. Regardless, my point is that because statutory interpretation depends very much on context, I would not assign the same probative value to unrelated, later-enacted statutes as does the majority.

First, Congress intended a broader compensation scheme under § 145 than under § 285.  *Compare* § 145 ("[a]ll the expenses of the proceedings"), *with* § 285 ("reasonable attorneys' fees").  For example, NantKwest does not contest that the language of § 145 includes the PTO's expert witness expenses.  In § 285, Congress chose not to award all the expenses to the prevailing party, but only attorneys' fees.  Congress can certainly employ a broad word over other narrower alternatives if it so chooses.

Second, as salaried employees, the PTO's attorneys do not bill individual hours for their work, nor do they collect fees from those whom they represent.  In this context, the overhead associated with the PTO's attorneys' work is more aptly characterized as an "expense" to the PTO than a "fee." *Compare Expense*, Black's Law Dictionary (10th ed. 2014) (defining "expense" as "expenditure[s] of money, time, labor, or resources to accomplish a result"), *with Attorney's fee*, Black's Law Dictionary (10th ed. 2014) (defining "attorney's fee" as "[t]he charge to a client for services performed for the client, such as an hourly fee, a flat fee, or a contingent fee").  I would not require Congress to mimic § 285 and use the phrase "attorneys' fees" when, in this context, "expenses" is the more apt term.

Third, the § 145 and § 285 provisions are implicated in different settings.  Section 285 arises in traditional patent litigation, and authorizes a district court to award attorneys' fees to the prevailing party.  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1752 (2014).  In contrast, § 145 proceedings are, "in fact and necessarily, a part of the application for the patent." *Gandy v. Marble*, 122 U.S. 432, 439 (1887).  The "[a]ll the expenses" contemplated by § 145 are a direct counterpart to the application fees that are designed to reimburse the PTO's examination expenses—application fees that, like the "[a]ll the expenses" of § 145, the applicant must pay regardless of whether it receives a patent.  Congress's use of different phrases therefore makes sense in these differ-

ent settings. And Congress's choice to depart from the model of a related statute is a choice we may not disregard.[2] *SAS Inst.*, 138 S. Ct. at 1355.

But I need not rely on the word "expenses" alone. Congress did not simply provide for "expenses of the proceedings" in § 145—it clarified that it was requiring the applicant to pay "*[a]ll* the expenses of the proceedings.*"

The majority maintains that "the word 'all' sheds no light on the breadth of 'expenses,'" and reasons that "all" "serves only to clarify that, whatever the 'expenses' are, all of them must be paid by the applicant." Majority Op. 30. I disagree. Such an interpretation leaves little work for "all" to do; simply saying "the expenses" would seem to do just as well. While this latter, more limited phrasing

---

[2]    The majority proposes that Congress should have amended § 145 to include the "attorneys' fees" language when it amended the Patent Act in 1946 to permit the "award [of] reasonable *attorney's fees* to the prevailing party" in infringement actions (i.e., the precursor to § 285). Majority Op. 24 n.7 (quoting Patent Act of 1946, ch. 726, 60 Stat. 778, 778 (emphasis added)). In other words, the majority would require Congress to review and amend § 145, its already-clear expense-reimbursement statute, so as to make it extra clear. This just can't be right. Especially not when, as I have detailed, the statutes are implicated in different settings and intentionally provide for compensation schemes of varying breadth. The majority seems to infer that because Congress added other statutory provisions (which arise in different circumstances), that it necessarily intended to *not* provide for the PTO's personnel expenses in those provisions it did not amend. This inference is far too attenuated to have any persuasive force.

would still not explicate the breadth of "expenses," neither would it, by itself, provide a basis for excluding anything properly regarded as an "expense." In my view, Congress used the word "all" to broadly and comprehensively capture anything fairly regarded as an "expense," resolving any lingering doubt in favor of inclusion. The majority acknowledges that the term "expenses" is capable of including attorneys' fees and cites to several statutes that list attorneys' fees as part of expenses. Majority Op. 20–21 (citing ten such statutes). In § 145, Congress's use of the word "all" indicated its desire to broadly and comprehensively include *all* of the expenses as it commonly understood them, which includes the personnel expenses the PTO incurs in defending § 145 actions.

## C

Both the legislative history and the purpose of § 145 support my reading of the statutory text and context.

The majority questions the relevance of legislative history in interpreting fee statutes. Majority Op. 30–31. I note, however, that the Supreme Court has examined legislative history in cases implicating fee-shifting and the American Rule. *E.g.*, *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 686–91 (1983); *Summit Valley Indus., Inc. v. Local 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 723–24 (1982).

Consideration of the history of § 145 suggests that Congress intended "expenses" to capture broadly, not narrowly. As the parties have noted, the "expenses" provision arose (in slightly different form) in the 1839 Amendments to the Patent Act, which provided that an applicant bringing a proceeding in equity to contest an adverse decision of the Patent Office would be required to pay "the whole of the expenses of the proceeding . . . whether the final decision shall be in his favor or otherwise." Patent Act of 1839, ch. 88, § 10, 5 Stat. 353, 354.

When Congress revised the Patent Act in 1870, it used expense-reimbursement language very similar to the language used in the previously enacted 1839 statute. Initial versions of the House bill sought to limit the reimbursement provision by using the word "costs" instead of "expenses" and by limiting any reimbursement to $25. But these changes were rejected and the word "expenses" was retained. The version of the bill reported in the House and referred to the Senate read, in relevant part:

> SEC. 52. And be it further enacted, That when the Commissioner of Patents is the only defendant in any such suit, *all costs shall be paid by the complainant*, and whole amount of costs taxed against the complainant shall not exceed the sum of twenty-five dollars . . . .

H.R. 1714, 41st Cong. § 52 (as referred to the S. Committee on Patents, Apr. 25, 1870) (emphasis added). The Senate made significant amendments to the bill, including changing Section 52 to use "expenses" rather than "costs" and by removing the $25 cap. The version passed by the Senate read, in relevant part:

> SEC. 52. And be it further enacted, That whenever a patent on application is refused, for any reason whatever, either by the Commissioner or by the supreme court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity; . . . . And in all cases where there is no opposing party a copy of the bill shall be served on the Commissioner, and *all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not*.

H.R. 1714, 41st Cong. § 52 (as amended by the Senate, May 31, 1870) (emphasis added). The House disagreed with the Senate amendments and asked for a conference. Ultimately, the House members dropped their objections

to the Senate amendments to § 52, and the enacted version reflected the Senate's version using the word "expenses." This demonstrates—or at least strongly suggests—that Congress specifically intended that "expenses" be broader than "costs."

The statute's purpose also confirms that Congress intended all of the expenses associated with § 145 proceedings to be borne by the applicants who elect them—not by taxpayers or other PTO users whose fees fund the agency's operations. Section 145 proceedings are an optional extension of the application process. *See Gandy*, 122 U.S. at 439–40 (referring to § 145's precursor as "in fact and necessarily, a part of the application for the patent" and "clearly a branch of the application for the patent"). And litigation in district court is expensive and time-consuming, much more so than the direct appeals limited to the administrative record also available to disappointed applicants. Proceedings under § 145 force the PTO and its employees to dedicate time and effort to conducting discovery, interviewing witnesses, filing and responding to motions, and addressing new evidence. PTO's En Banc Br. 22.

Indeed, even in 1838, Congress was aware that proceedings in equity were adding to the Patent Office's expenses—including labor expenses. H.R. Rep. No. 25-797, at 3 (1838) (discussing the 1839 Act). A letter from the Commissioner of Patents annexed to the House Report stated:

> The judicial decisions on interfering applications, subsequent to the examination, on application, will, both in number and importance, exceed all the patent cases before the United States courts. On the first of January three cases were pending a hearing, valued at upwards of $100,000 each. The evidence is voluminous, and the arguments often lengthy. *The subject of appeals is beginning*

*to add considerably to the labor of the office,* and the litigated cases demand many long copies.

*Id.* (emphasis added).

An applicant's choice to proceed under § 145 diverts the agency's resources from the PTO's principal mission of examining patent and trademark applications at the agency. The purpose of § 145's expense-reimbursement provision is to ensure that these expenses fall on the applicants who elect the more expensive district court proceedings over the standard appeal route.

## III

The majority concludes that the text of § 145 fails to provide the necessary congressional directive to overcome the American Rule's bar against shifting attorneys' fees. Under the American Rule, "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Courts uniformly recognize an exception to this general proposition, however: when the statute itself "specific[ally]" and "explicit[ly]" authorizes an award of fees, the prevailing party may be entitled to collect its fees. *Alyeska*, 421 U.S. at 260.

I note that the Fourth Circuit reviewed 15 U.S.C. § 1071(b)(3), which contains language nearly identical to the relevant language in § 145, and concluded that the statute is "not a fee-shifting statute that operates against the backdrop of the American Rule" because it "mandates the payment of attorneys['] fees without regard to a party's success." *Shammas*, 784 F.3d at 223. While I assume that the American Rule applies here, I share the Fourth Circuit's doubt that the Rule applies in this context—i.e., where Congress has simply assigned payment responsibility to the applicant, consistent with the various

other application-related fees Congress has assigned to the applicant.

But even assuming the American Rule applies here, I still disagree with the majority's analysis. For example, the majority attempts to create ambiguity by focusing on the word "expenses" in a vacuum. But, as I've discussed, Congress did not simply provide that under § 145 an applicant pays "expenses." Nor did it say "may pay" or something that could be less than "all." Congress said that the applicant "shall" pay "[a]ll the expenses of the proceedings."

It is also well established that "[t]he absence of specific reference to attorney[s'] fees is not dispositive if the statute otherwise evinces an intent to provide for such fees." *Key Tronic Corp. v. United States*, 511 U.S. 809, 815 (1994). Although the majority gives lip service to this principle, as a practical matter, it still seems to require a statute's use of the magic words "attorneys' fees" to meet the American Rule's heightened demands.[3] For example, the majority spends pages contrasting § 145 unfavorably with other statutes that explicitly mention attorneys' fees.

---

[3]     When asked during oral argument to propose other language that Congress could have employed to overcome the American Rule, NantKwest offered "including, without limitation, the time spent by lawyers working on the particular matter from the Solicitor's office . . . and outside counsel" or "persons providing lawyer services who are hired internally or externally by the Patent Office" as the only alternatives. Oral Argument No. 2016-1794 (Mar. 8, 2018) 40:45–41:23, 43:57–44:05, http://www.cafc.uscourts.gov/oral-argument-recordings. I do not believe the American Rule requires such labored descriptions, when "[a]ll the expenses of the proceedings" suffices in this context.

Majority Op. 18–24.  It further cites a Congressional Research Service Report compiling the text of other fee-shifting statutes.  The majority notes that each of these statutes recites either the magic words "attorneys' fees," or the (slightly) less magical "fees," "fees for attorneys," "compensation . . . for attorney[s]," "fees of counsel," and the like.  Majority Op. 29 n.8.

But again, the absence of "attorneys' fees" is not dispositive.  In making clear that "[t]he absence of specific reference to attorney[s'] fees is not dispositive if the statute otherwise evinces an intent to provide for such fees," the Supreme Court pointed to an Eighth Circuit decision, stating that "[t]he Eighth Circuit, for example, found 'a sufficient degree of explicitness' in [the Act's] references to 'necessary costs of response' and 'enforcement activities' to warrant the award of attorney[s'] fees and expenses." *Key Tronic*, 511 U.S. at 815.  The Court then contrasted these sufficiently explicit phrases with "[m]ere 'generalized commands,' . . . [which would] not suffice to authorize such fees." *Id.*  Surely, "[a]ll the expenses of the proceedings" is just as, if not more, explicit than "necessary costs of response" or "enforcement activities" in reference to personnel expenses.

In sum, contrary to the majority's views, the language of § 145 evinces Congress's "specific and explicit" intent to depart from the American Rule and to impose upon the applicant payment of all the expenses of the proceedings, including the PTO's personnel expenses.

## IV

The majority also references certain policy justifications for its interpretation of § 145.  First, the majority cites the access-to-justice concern underlying the American Rule.  Majority Op. 6.  I am unconvinced that these disappointed applicants' access to justice is lacking.  Applicants have the option to forgo § 145 actions altogether and pursue appeals before this court under § 141—

a choice the overwhelming majority of applicants make. *See Hyatt*, 625 F.3d at 1337 (observing that "the vast majority of applicants pursue an on-the-record appeal [under § 141] instead of a § 145 action"). These disappointed applicants only reach the point of electing a § 145 action after an extended application examination process before the PTO. A patent examiner first determines whether the application satisfies the statutory prerequisites for granting a patent. *Kappos*, 566 U.S. at 434 (citing 35 U.S.C. § 131). If the examiner denies the application, the applicant may then file an administrative appeal with the PTO's Patent Trial and Appeal Board. *See id.* If the Board also denies the application, only *then* is the disappointed applicant faced with electing between an appeal under § 141 or a § 145 action. *Id.*

Second, and relatedly, the majority expresses special solicitude for "small businesses and individual inventors," Majority Op. 6–7, presumably because they may be less able to afford the PTO's personnel expenses. This possibility is entirely speculative. And, even if it were always the case, it is of no moment. "Our unwillingness to soften the import of Congress'[s] chosen words even if we believe the words lead to a harsh outcome is longstanding." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015) (quoting *Lamie v. United States Tr.*, 540 U.S. 526, 538 (2004)).

While I do not deny that the PTO's personnel expenses may, in some cases, amount to substantial sums, it is important to view these amounts against those expenses that applicants must undisputedly pay if they elect a § 145 action. For example, the parties do not dispute that "[a]ll the expenses of the proceedings" includes the PTO's expert witness expenses. In *Booking.com B.V. v. Matal*, aside from the $51,472.53 in personnel expenses, the applicant was required to pay $21,750 in expert witness expenses. No. 1:16-CV-425, 2017 WL 4853755, at *4 n.3 (E.D. Va. Oct. 26, 2017). In *Realvirt, LLC v. Lee*, the

expert witness expenses amounted to *more* than the $48,454.62 in PTO personnel expenses, costing the applicant $50,160. 220 F. Supp. 3d 695, 704 (E.D. Va. 2016). Finally, in *Taylor v. Lee*, the court made it clear that the PTO's motion for the $40,000 bond cited by the majority should be granted, *even if* the PTO's $45,000 in personnel expenses were not included because the other anticipated expenses, including expert witness expenses, were reasonably expected to exceed $40,000. No. 1:15-CV-1607, 2016 WL 9308420, at *2 n.1 (E.D. Va. July 12, 2016).

Further, unless the applicant is proceeding pro se, it is of course quite likely that its own attorneys' fees would vastly exceed the PTO's personnel expenses.[4] Indeed, I wonder who the majority seeks to protect: the hypothetical applicant who would pay its own attorneys and the PTO's expert witness expenses, yet balk at the PTO's personnel expenses.

And while it may be true that the PTO's personnel expenses in some cases might amount to a significant sum for applicants who choose to proceed down the optional § 145 route, those expenses have to be paid by someone. As the PTO observes, at Congress's direction, the PTO now must operate entirely as a user-funded agency. PTO's En Banc Br. 23. All applicants pay a number of fees throughout the patent-examination process to cover the PTO's expenses of operation. *Id.* at 24. Thus, in asking this court to exclude personnel expenses from "[a]ll the expenses of the proceedings," NantKwest asks this

---

[4] For example, in this case, the PTO's calculations indicated that its attorneys earned only $78.55 per hour, yet the district court has authorized a range of rates for private attorneys between $300 and $600 per hour. J.A. 84 & n.7 (citing *Tech Sys., Inc. v. Pyles*, No. 1:12-CV-374, 2013 WL 4033650, at *7 (E.D. Va. Aug. 6, 2013)).

court to require *other* PTO applicants to pay the PTO's personnel expenses incurred in response to its § 145 complaint, rather than NantKwest itself. This contravenes Congress's intent. The statutory language is clear: it is the applicant that voluntarily chooses a § 145 action, and not other PTO users, who must pay "[a]ll the expenses of the proceedings." Thus, the question of the equitable allocation of burdens is one that Congress has already addressed in the language of the statute. It is not this court's job to allocate those burdens differently based on our own policy preferences.

Finally, much is made of the fact that the PTO refrained from seeking reimbursement for its personnel expenses until recently, despite the provision's 170-year existence. Notably, however, while the PTO has historically refrained from seeking reimbursement of these expenses, it has never affirmatively disclaimed that authority. Given how dramatically the patent and litigation landscapes have changed since the provision was first enacted, it is hardly surprising that the PTO would have felt compelled in recent years to change its strategy. The PTO's past decisions to not seek reimbursement for its personnel expenses may be related to the fact that it is so rarely confronted by these cases. The PTO now points, however, to how § 145 proceedings have become more common and more expensive. PTO's En Banc Br. 30. Accordingly, the PTO has become increasingly reluctant to require other PTO users to subsidize the expenses of these optional proceedings, in light of Congress's mandate that the PTO fund itself exclusively through fees.

Even within the more rigorous administrative rulemaking environment, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Further, even where longstanding policies may have engendered reliance interests, an agency may still change its position as long

as it shows that there are good reasons for the new policy. *Id.* at 2126.  The PTO has done so here.

*   *   *

Because Congress meant all the expenses of the proceedings when it said "[a]ll the expenses of the proceedings," I respectfully dissent.